WILLIAM F. FISHER et al., appellants,

*v.*

WILLIAM L. BULL et al., respondents.

1. It is well-settled law that an assignee of a non-negotiable or matured debt takes it subject to all the equitable defences that the original debtor may have.

2. One who is about to become the assignee of such a debt must at his peril find out from the debtor whether there are any equitable sets-offs or defences.

3. William L. Bull held in trust for Harry F. Worthington a certain mortgage made by Fisher & Furman. Fisher & Furman became sureties for said Harry F. Worthington on an attachment bond and took as indemnity an assignment of his interest in said mortgage, and by force of proceedings in said attachment suit were forced to pay the judgment rendered therein against

said Harry F. Worthington. Subsequently William L. Bull and others (executors of Henry R. Worthington) purchased of Harry F. Worthington his interest in said mortgage and took from him an assignment of all his interest therein. Upon a foreclosure of said mortgage by Bull, trustee, for the benefit of the last-mentioned assignees—*Held*, that Fisher & Furman, the mortgagors, were entitled in equity to set off the amount paid by them for said Harry F. Worthington under their prior assignment.

On appeal from a decree advised by Vice-Chancellor Bird in *Bull, Trustee,* v. *Fisher et al.,* whose opinion is as follows:

The bill in this case is filed to foreclose a mortgage. The defendants Fisher & Furman say that they are entitled to be first paid out of the proceeds of the sale of the mortgaged premises the amount of a certain judgment in attachment against Harry F. Worthington, on whose bond, in such attachment, they became surety, and, as an indemnity for so doing, took an assignment of his interest in this bond and mortgage. They insist that the complainant, through his counsel, Mr. Jenner, had notice of their interest in this mortgage. They have endeavored to show that his counsel, Mr. Jenner, had this notice, from the fact that he had a general knowledge of all the transactions which lead up to the execution of the assignment, and also of the difficulties which prevented the sale of the lands so mortgaged until this assignment was agreed upon. Enough of the transactions and the difficulties may be given in a few words.

Henry R. Worthington died leaving a last will and naming his executors. Before his death he had made some agreement respecting the sale of the land covered by this mortgage. After his death the Worthington Brick Company brought suit against his executors to compel specific performance of the alleged contract of the testator. Pending this suit Fisher & Furman made· an offer for the land in controversy, which was considered by the owners, and a sale was at length effected, with the understanding that the fund should represent the land in the litigation. Difficulties were encountered in completing the sale. An important one was the existence of an attachment against the·

interest of Harry F. Worthington, a son of the testator.    Harry
having, or claiming to have, an interest in the land, this attach-
ment was a bar to a perfect title.    Fisher was to give a mort-
gage on his half of the land in case of a sale, and, in order to
remove the attachment, Harry agreed to assign all of his interest
in the said mortgage to Fisher & Furman, the purchasers of the
title, in case they would become his sureties on a bond in the
said attachment.    And the matter was closed up in this way.
The attachment was determined against Harry.    Fisher & Fur-
man paid the judgment and costs, and these they now claim are
a first lien on the proceeds of the sale in this case if a sale be
ordered, and they make this claim because they say that the
complainant had the notice above intimated.    And this is the
important question in the case.

    This claim of notice is set up by the defendants in their cross-
bill, and the burden of proving it is on them.    It must be made
to appear that Jenner knew of the assignment as a fact, or of
such other facts as would prompt a prudent man to inquire, and
if he did, would have discovered the fact.    It is not enough to
assert simply that he was in a position where he might have
known or learned of them.    It will doubtless be agreed that the
court cannot base a decree upon what might have been.    The
question is not what might have been, but what actually was
heard or seen.    Did Jenner, as the counsel of the complainant,
see this assignment and know what interest it was intended to
assign, either from reading it or from any other source, or did
he have such facts communicated to him as would prompt a
prudent man to investigate?

    These observations have been induced by the very strong
argument of counsel, that because the attachment matter was so
seriously in the way of the sale, and was so much the subject of
conversation by those who were interested in effecting the sale,
and because Jenner was the counsel of the complainant, and
through him all the negotiations were carried on, and because he
was in the office of Bryan, the counsel of the other Worthing-
tons who had an interest, in whose office the change of the title
was effected, for more than two hours at the time of such change

of title, during which time the assignment was lying on Bryan's table, he must certainly have learned of the assignment.

And this leads me to observe that if the fact had in any direct manner been communicated to Jenner, there would have been preserved the most satisfactory proof of it. This arises from the exceeding great care exercised by both Jenner and Bryan in making memoranda of all the transactions respecting this matter with which either of them had anything to do, even to the smallest details, which have been preserved and produced in great fullness in court and offered as evidence. And yet there is nothing from which I can infer in the remotest degree that anyone informed Jenner that the mortgage which Fisher was to give, and in which Harry had an interest, was to be assigned by Harry to Fisher & Furman as an indemnity.

Again, when I consider the exceeding great care evinced by Jenner in this matter, in guarding the interests of the estate of the testator, not only as to the perfect arrangement of all of the details, but also as to the preservation of the just equality of the different interests, and that all of these were from day to day noted and communicated to his client, it seems to me quite incredible that a matter, which in the event of the suit of the brick company being determined against the estate would be likely to prove so serious, involving the whole $35,000, should have been entirely forgotten.

But, in looking at the statement of the witnesses and taking it for granted that the difficulty of removing the attachment was one of the chief, and it may be the very last, in the way of completing the transfer, we can discover just what approach there was towards showing that Jenner had knowledge. Mr. Bryan speaks of a moral conviction that he had informed Jenner of the assignment, but in his testimony he does not venture beyond this, of which more hereafter. In the following questions this point was held up before Mr. Adrain, who was the counsel of the attaching creditor and who had had interviews with counsel and parties (excepting Mr. Bull) respecting the attachment, namely :

Fisher *v.* Bull.

"*Q.* Can you say from your distinct recollection that Mr. Jenner knew of this assignment of Harry F. Worthington's interest in that mortgage to Fisher & Furman as collateral security?

"*A.* It would be impossible for me to say exactly what I told Jenner, but my recollection is that I assured the parties who were representing the vendors that it was absolutely necessary that that attachment should be raised; and I have a moral certainty that Mr. Jenner was present and informed of that fact, but as to what time I conveyed it to him I can't say, but I know that they were all there during the day on which the transfer was made, running in and out, for the purpose of bringing the links together."

And again :

"*Q.* Mr. Jenner was fully aware that the title could not pass until the attachment was removed?

"*A.* As fully as I have suggested.

"*Q.* Was he aware that in accomplishing that, Harry F. Worthington had made an assignment of his interest in that property to Fisher & Furman, who were to be his bondsmen in removing the attachment?

"*A.* My impression is that he was; I was distinct and open in my declaration that that must be raised; my impression is that that matter was openly discussed, not only in reference to lifting the attachment, but the character of the searches and the fact of the assignment."

And there is no stronger or more certain evidence that Mr. Jenner was informed of this assignment than that given by Fisher himself. He swears that he spoke to Jenner several times, pending the negotiations, about the assignment of the mortgage to Fisher & Furman as an indemnity. If I understand Mr. Fisher's testimony correctly, these interviews with Jenner must have been a considerable period of time before Fisher's own counsel or Mr. Bryan had even considered or thought of making such assignment in order to get rid of the attachment. Indeed, the giving of this mortgage was not talked of until the 26th of March, 1883, but upon that day, for the first, Mr. Bryan expressed the thought that the object in view, to wit, completing the sale, might be consummated, for on that day Mr. Bryan says he received a letter from Mr. Jenner, in which he wrote: " I have just heard from my client; he supports me in declining to take back the mortgage on an undivided half." He adds :

"But before I got that letter, my son went and delivered my letter that I wrote on March 26th; my son reported that he read it and said, 'I have written an answer and said that we won't do it;' my son further reported that he asked him whether he would consent to a mortgage on an undivided half if we would agree to take it on account of our share, and he said he would; my son further reported that Mr. Jenner said that he wished that put in the stipulation; my son had my authority to say this, and he further reported that Mr. Jenner said, 'It will not be necessary to see Mr. Bryan; we will do it.'"

Thus, while it appears that, in order to oblige Mr. Fisher, who wanted to be accommodated by giving a mortgage, an effort was made to induce Mr. Jenner to accept such mortgage on Fisher's undivided one-half, but which Jenner had not accepted, and which, on this 26th day of March, he positively refused to accept. It was not until that day suggested that the mortgage might so be taken provided Mr. Bryan would stipulate that it should be taken on behalf of his clients. This being so, it does not seem at all reasonable that, prior to that date, there should have been any talk between any of the parties interested respecting the assignment of the mortgage by the said Harry. But Mr. Jenner consenting, the whole matter was speedily arranged; and as soon as Mr. Bryan could get his clients and Mr. Adrain in his office, which I think was upon the 28th of March, it was agreed that Fisher & Furman should become sureties on the bond in attachment, and that this mortgage, which Jenner had consented to, provided it should be taken on the account of Mr. Bryan's clients, should be assigned to Fisher & Furman as an indemnity. On the 30th of March such assignment was prepared and executed, although dated upon the 28th. On the 26th Mr. Bryan entered in his memorandum-book the following:

"I hope to be able to get Messrs. Fisher & Furman to go security on the H. F. W.'s bond to lift the attachment; to do this I may be obliged to give them some claim on our interest in the mortgage."

He does not say what the nature of that claim shall be.

It seems to me, therefore, very reasonable to infer that this method of relieving the land from the attachment was not considered until the 26th day of March, and that the exact mode

by which Fisher & Furman were to be secured upon the interest of said Harry was not on that day determined upon.

With these facts before the mind, it seems to be conclusive that Mr. Fisher was mistaken in saying that he had several times informed Mr. Jenner that he and Furman were to become sureties for Harry in the attachment, and Harry was to assign his interest in the bond and mortgage as an indemnity.

I think, in this connection, it deserves attention that as soon as Mr. Jenner heard of this assignment and of the claim that was made under it, he denied having any previous knowledge of it, which evidence only became admissible by being introduced by the defendants in this manner—that is, when Mr. Bryan was being examined on this point he said that he was morally certain that Mr. Jenner knew of the assignment before the settlement which took place on the 2d of April, 1883, but was not prepared to swear that he did so know, for he understood that Mr. Jenner denied any such knowledge; and when this denial was communicated to Mr. Bryan (this was in May, 1885), he wrote to Mr. Jenner not to be too hasty in his contradictions until he saw him; and although Mr. Jenner asked Mr. Bryan for any facts which he had referring to this knowledge, Mr. Bryan had none to give; but notwithstanding these things, it is urged that Mr. Jenner had notice of this assignment April 2d, 1883, when the parties met in the office of Mr. Bryan to pass the title and pay the consideration money or to secure its payment, at which time Mr. Jenner was present. As I have stated, Mr. Jenner positively denies all knowledge of this assignment prior to May 13th, 1885. He admits that he was present in Mr. Bryan's office when the sale was completed, during most of the time between the hours of two and four, during which time the principal part of the work in perfecting the papers, and in delivering them, and in making all the calculations, and in drawing and passing the checks, was done. It is conceded by the defendants that during this time Mr. Jenner spent the most of his time, if not about all of it, upon a sofa some distance from the table where the work was done. It is conceded also that during this time the assignment was upon Mr. Bryan's table, but there is no

satisfactory proof that Mr. Jenner so much as saw the paper, saying nothing about his having any knowledge of its contents. To adjudge that because a person who may have an interest in a certain transaction, expressed or represented in some document, happens to be in a room where that document is and nothing else appears to have passed to have brought it to his attention, had knowledge of such instrument, would itself be adjudged to be quite unreasonable.

I think, therefore, that the effort to charge the complainant with notice has not been satisfactorily sustained. Although I did not think that counsel for Fisher & Furman seriously pressed the allegation that the complainant had notice through the registry of the assignment, perhaps I ought not to let that point pass unobserved. The assignment was not recorded until after the complainant's interests were fixed, and it is clear enough that in such case the record does not amount to notice. *Hoy* v. *Bramhall, 4 C. E. Gr. 563, 572.*

It being established that the complainant did not have notice, he holding the mortgage as he did, in trust, and the *cestui que trust,* independent of the assignment, being competent to join therein, had a right to settle with the trustee, and did so in May, 1885, it therefore seems impossible to charge the complainant now upon the ground of notice. The complainant, I think, is entitled to the whole amount due on said mortgage, and I will advise a reference in order to ascertain that amount.

*Mr. Abraham V. Schenck,* for the appellants.

*Mr. John Linn,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

The bill in this case is to foreclose a mortgage. In form the suit is between William L. Bull, trustee, the holder of the legal title to the mortgage, and Fisher & Furman, owners as tenants in common of the legal title to the mortgaged premises. The real

·contest, however, is between Bull and others (executors under the will of Henry R. Worthington, deceased), who claim, as equitable assignees of Harry F. Worthington, the *cestui que trust* of the mortgage, and the defendants Fisher & Furman, the mortgagors, who claim a right in equity to set off the amount paid by them for said Harry F. Worthington under a prior assignment to them of his interest in said mortgage debt. The transaction that gave rise to that situation was this: In 1880 Henry R. Worthington and Harry F. Worthington, his son, were owners as tenants in common of certain premises known as the Worthington brick property. On March 3d, 1880, Harry F. Worthington conveyed to the Worthington Brick Company, a corporation under the laws of New York, his equal undivided one-half part of the premises in question. Henry R. Worthington, the father, died in December, 1880, without having conveyed his undivided half. By his last will he appointed as the executors thereof his widow, Sara N. Worthington; his two sons, Charles C. Worthington and said Harry F. Worthington, and his son-in-law, William L. Bull, who proved the will and took upon themselves the administration of said estate, with power to convey lands. On August 5th, 1881, an action was begun in the supreme court of the State of New York by the Worthington Brick Company, as plaintiff, against the said executors, for the specific performance of an agreement to convey the undivided one-half part of said lands, made by said Henry R. Worthington in his lifetime. While this action was pending a proposition was made for the purchase of the Worthington brick property by William F. Fisher and Noah Furman, which was accepted, and, in order to insure a good and sufficient title thereto, all of the parties in interest joined in a series of conveyances and stipulations by which the legal title to said property passed to Fisher & Furman in consideration of certain payments of cash and a purchase-money mortgage of $9,000, executed by said Fisher on his undivided one-half of said property. This is the mortgage now sought to be foreclosed. The mortgage was accordingly made to William L. Bull as trustee, for whom it might concern among the parties to the action then pending in

the court of New York; and it was further stipulated that the said bond and mortgage should be considered in any final division or distribution of the proceeds of said sale as belonging to and distributable in the undivided half formerly belonging to the said Harry F. Worthington in the said lands and premises. In 1884 Fisher paid on the principal of said mortgage the sum of $6,000, and in 1885 conveyed to Noah Furman his one-half interest in the said premises.   In 1887 William L. Bull, trustee, filed his bill against said Fisher & Furman to foreclose said mortgage, which proceeding has since been amended by joining as parties thereto the legal representatives of Henry R. Worthington, deceased.   In his replication in this suit, William L. Bull, the complainant, states that the said executors of Henry R. Worthington (of whom he was one) had made a settlement with Harry F. Worthington with respect to his interest in said mortgage and had taken from him an absolute assignment of all his (said Harry F. Worthington's) interest in the same, as such *cestui que trust* to the estate of said Henry R. Worthington, deceased.   In his said replication the complainant further states that, as trustee under said stipulations, he assented to the said assignment and that he still holds said mortgage for the benefit of the said executors under this assignment, and in their interest filed the bill of complaint to foreclose the same.

Turning now to the claim of the defendants Fisher & Furman, the case shows that they have an equitable defence to the said mortgage, resting upon a certain payment by them for and on behalf of said Harry F. Worthington, under an assignment to them of his interest in said mortgage, prior in point of time to the assignment by which the executors of Henry R. Worthington, deceased, claim title.   The transaction with the defendants was in this wise: After Harry F. Worthington had conveyed his undivided interest in the brick property to the Worthington Brick Company, one James Sweeney, on the 5th day of October, 1881, sued out a writ of foreign attachment in this state against said Harry F. Worthington, under which the interest of said Harry F. Worthington in all of said lands was seized and attached.   After the death of Henry R. Worthington and after

the commencement of the suit for specific performance in New York, and in order to effectuate the conveyance above mentioned to Fisher & Furman, and to free the premises from all encumbrances, the said Fisher & Furman became sureties for the said Harry F. Worthington to the said Sweeney, the plaintiff in attachment, whereupon the premises were released from the lien thereof. The said Harry F. Worthington, in order to indemnify said Fisher & Furman, assigned and transferred to them, as collateral security, his interest in the said bond and mortgage held by William L. Bull, trustee as aforesaid, which act of assignment was, by the deed of said Harry F. Worthington, dated and delivered March 30th, 1883, the same day upon which the said mortgage to Bull, trustee, was acknowledged and delivered. Subsequently, the said attachment was prosecuted to a verdict against said Harry F. Worthington and an action brought against the said Fisher & Furman on their said bond, as sureties, whereby they were compelled to pay, and did pay, for said Harry F. Worthington, on the 22d day of January, 1886, the amount of said verdict, to wit, $2,402.35, together with the costs and interest thereon, for which sum they now claim a deduction from the balance remaining due upon the said mortgage.

From this recital it is evident that the real complainant in equity is not William L. Bull, the trustee of said mortgage, but William L. Bull and others, executors of Henry R. Worthington, deceased, whose claim rests not upon or through the legal title of William L. Bull, trustee, but solely upon their settlement with Harry F. Worthington and his consequent assignment to them of his interest as the *cestui que trust* of said mortgage. The defendants Fisher & Furman may in equity be regarded indifferently as prior assignees of the interest of Harry F. Worthington, or as mortgagors who have discharged part of their debt. In the court of chancery the case was tried upon the theory that William L. Bull, trustee, must recover upon the strength of his legal title unless he had notice of the assignment by his *cestui que trust* to Fisher & Furman. Upon this point a large mass of testimony was taken, which, however, failed to satisfy the learned vice-chancellor that notice had been given,

who thereupon has advised a decree in favor of the complainant for the entire balance due on said mortgage.

It would seem clear that in this disposition of the case the real parties in interest are lost sight of, as likewise is the true nature of their dispute.   The essential facts to be dealt with were these : *First.* That Harry F. Worthington, who was in equity the owner of the debt due from Fisher & Furman, received from them a certain part thereof for which he assigned to them his interest in their own debt.   *Second.* That Harry F. Worthington afterwards assigned all of his interest in said debt to the executors of his father's estate.

From this brief summary of the case it is evident that under a mass of detail the real transaction was simply the purchase by the complainants of a debt that had been partly paid by the debtor to their assignor.   That an assignee of a bond and mortgage or any other non-negotiable or matured debt takes it subject to all the equitable defences that the original debtor may have, is a settled rule in this state as well as elsewhere.   *Magie* v. *Reynolds, 6 Dick. Ch. Rep. 113,* and cases there cited. Whether Bull, trustee, had notice of the first assignment, is not a question that concerns us, for the reason that no party in interest claims through the legal title of which he was trustee, the real parties having dealt, over his head, directly with the owner of the debt in equity.   That there might have been such action by Bull, trustee, in the execution of his trust as would have postponed a prior assignee to the taker of the legal title without notice to the trustee, may be conceded without affecting at all the decision of the case in hand.   At bottom the doctrine of notice is part of the law of negligence.   It is undoubtedly true, as a general rule, that an assignee of a fund is negligent if he fail to give notice to the depositary, who otherwise may innocently pay it out to a subsequent assignee.   That is not the case here, where the first assignee is not only the debtor, but is also, so to speak, the depositary of the fund itself.   The case discloses no negligence of which the second assignees can complain.   They were buying a debt, and it was clearly their duty to find out from the

debtor whether he had any set-off. Having neglected to do this they must be postponed to the just claim that he now presents.

The case will be remitted to the court of chancery, in order that an account may be taken and a decree entered in accordance with these views.

*For reversal* — THE CHIEF-JUSTICE, ABBETT, DEPUE, DIXON, GARRISON, LIPPINCOTT, REED, VAN SYCKEL, BOGERT, BROWN, KRUEGER, SMITH—12.

*For affirmance*—None.